**In the Interest of R.B. and J.B.**

**No. 05–05–00293–CV.**

Court of Appeals of Texas, Dallas.

Aug. 22, 2006.

Rehearing Overruled Sept. 18, 2006.

Gregg M. Gibbs, McKinney, Attorney Ad Litem.

Michael Sloan, Law Offices of Michael Sloan, McKinney, for Appellant.

Shawn Richards, Rockwall, and Lana Shadwick, Texas Dept. of Protective and Regulatory Services, Houston, for Appellee.

Before Chief Justice THOMAS and Justices MORRIS and FITZGERALD.

## OPINION

Opinion by Justice FITZGERALD.

The Texas Department of Family and Protective Services (the Department) petitioned the trial court to terminate the parental rights of Mother to her young sons, R.B. and J.B. A unanimous jury concluded the parent-child relationship between Mother and each child should be terminated, and the trial court ordered termination. In four issues, Mother argues (1) the trial court should have enforced the parties' mediated settlement agreement to her benefit; (2, 3) the evidence is legally and factually insufficient to support the jury's verdict; and (4) the trial court should have granted Mother's motion for new trial. For the following reasons, we affirm the trial court's order.

### BACKGROUND

R.B. and J.B. were first removed from their home by the Department in October 2002, following a home fire of undeter-

mined origin.[1] Father was a drug abuser. Mother, a recovering alcoholic, took a number of prescription medications for conditions including a painful arthritic condition and depression. The children were returned to the home, but were removed again in June 2003, after police discovered the boys outside with no supervision and Mother asleep inside the house. Some months later, Father died of an accidental drug overdose.

In 2004, at the Department's request, Mother and the Department mediated the custody issue and arrived at a Mediated Settlement Agreement and Rule 11 Agreement (the Agreement). The Agreement named the Department permanent managing conservator of R.B. and J.B.; Mother was named possessory conservator with visitation rights. Pursuant to the Agreement, Mother was to execute an Affidavit of Relinquishment of Parental Rights that would be kept under seal. The Agreement contained a three-step process whereby Mother could regain custody of the children:

(1) participation in an approved inpatient substance abuse program by May 15, 2004;

(2) following completion of the inpatient program, participation for 90 days in:

(a) all drug treatment aftercare recommendations, and

(b) counseling as recommended by her counselor; and

(3) following completion of the requirements of those 90 days, a gradual return of the children to Mother's care and then a 90-day monitoring of the family by the Department to assure the environment did not pose a substantial risk of harm to the children's physical or emotional well-being.

The Agreement provided that if Mother failed to comply with any step, the relinquishment affidavit would be unsealed and an order terminating Mother's parental rights would be entered. If she successfully completed all steps, the affidavit would be unsealed and destroyed, and Mother would be named permanent managing conservator of her sons. The trial court signed its Final Order in Suit Affecting the Parent–Child Relationship on February 16, 2004; the order incorporated the Agreement.

Mother completed her inpatient treatment and was discharged on March 25, 2004. Through counsel, she requested the Department pay for her outpatient treatment and counseling service in a program called First Step. But on May 21, 2004, First Step discharged Mother from its program for lack of attendance. On July 2, 2004, the Department moved to enforce the Agreement. The motion asked the court to make a finding that Mother had failed to participate in drug treatment aftercare recommendations and to enter an order terminating Mother's parental rights. The court heard and denied the Department's enforcement motion; the order gives no reason for the denial.

The trial court subsequently ordered the parties to trial. Mother then filed her own motion for enforcement of the Agreement. The motion asserted that Mother had now completed her aftercare program and was entitled to the return of her children under the Agreement. Before the court ruled on the motion, Mother filed an Original Petition to Enforce Mediated Settlement Agreement, which sought an injunction against the trial setting and argued that the Agreement resolved all issues between

---

1. Mother had been involved with the Department earlier than this date concerning her two older children. Those children are not at issue in this proceeding.

the parties. The petition specifically sought immediate enforcement of the Agreement, asserting that Mother had complied with all the Agreement's requirements. The trial court denied the request for injunction.[2]

Significant portions of the testimony at trial are discussed below. The jury concluded Mother had:

1. ... knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; [and/or]

2. ... engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children.

The jury also concluded that termination of the parent-child relationship would be in the best interest of the children. The jury was instructed to make its verdict based on clear and convincing evidence; its verdict was unanimous.

Mother filed a motion for new trial. The trial court heard the motion and allowed it to be overruled by operation of law. Mother appeals.

### ENFORCEMENT OF THE MEDIATED SETTLEMENT AGREEMENT

■ In her first issue, Mother argues the trial court erred when it refused to enforce the Agreement in her favor. As we discussed above, both parties moved for enforcement of the Agreement, and the trial court denied both parties' requests.

In this Court, Mother argues that the trial court's denial of the Department's motion in July was an implicit finding that she had complied with her obligations under the Agreement. We disagree. First, the evidence before the trial court at the time of the Department's motion established that Mother had not completed aftercare in the time frame required by the Agreement. Second, the trial court denied Mother's own motion to enforce as well. As the trial court had no discretion to vary the terms of the parties' Agreement, the trial court had no alternative but to deny her motion. *See Garcia–Udall v. Udall,* 141 S.W.3d 323, 332 (Tex.App.-Dallas 2004, no pet.). We cannot look at the resolution of the Department's motion to enforce in a vacuum: if the trial court had denied the Department's motion because Mother had complied with her obligations, then the trial court would never have denied Mother's motion to enforce and ordered the parties to trial.

We decline to speculate as to the basis for the trial court's orders. Mother failed to complete the aftercare program required by the Agreement in a timely manner. The trial court could not simply excuse Mother's failure to comply with the timetable in the Agreement. *See id.*

We conclude the trial court correctly refused to enforce the Agreement in Mother's favor.[3] We decide Mother's first issue against her.

### SUFFICIENCY OF THE EVIDENCE

■ In her second and third issues, Mother argues the evidence is legally and

2. Mother filed an interlocutory appeal, which was dismissed as moot but "without prejudice to bringing these complaints in her appeal of the final judgment terminating mother's parental rights to R.B. and J.B." In a footnote, this Court explained that "any decision regarding the trial court's refusal to enforce a settlement agreement directly impacts the rendition of the final judgment terminating mother's parental rights and is properly considered in that appeal."

3. We observe the Department does not complain of the trial court's order refusing to enforce the Department's motion to enforce.

factually insufficient to support the jury's verdict. Termination of parental rights is a drastic remedy, and due process requires the State to justify termination by clear and convincing evidence. *See Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). To that end, the Texas Supreme Court has directed appellate courts to review termination findings to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002). In a legal sufficiency review, we view the evidence in the light most favorable to the judgment, disregarding only the evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). In a factual sufficiency review, we must give "due consideration" to all evidence the fact finder could reasonably have found to be clear and convincing. *Id.* We must also consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of the termination finding. *Id.* Evidence is factually insufficient if, given the entire record, the disputed evidence that a reasonable fact finder could not have resolved in favor of the termination finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction about the truth of the State's allegations. *Id.* A court may order involuntary termination of a parent's rights only if the court finds that: (1) the parent has committed a predicate act or omission harmful to the child, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002).

### Undisputed Evidence

Father met Mother at a meeting of Alcoholics Anonymous, but he began drinking and abusing drugs after the birth of his second son. At least once, Father tested positive for cocaine, and he abused Mother's prescription medicine. One officer estimated police had responded to more than twenty calls to the family's residence complaining of Father's violence or drug-related problems. Father was arrested for assault twice during this period; at least once, he was jailed for theft. He was in drug rehabilitation programs four times before he died.

Two fires broke out during this period, both times in the boys' bedroom. After the second fire, in October 2002, the Department removed the children from their home for more than a month. They were allowed to return so long as Father was not living there.

There was evidence the boys (at the time aged four and two) learned to open exterior doors and repeatedly left the home unsupervised. A number of witnesses recounted one of these incidents, which occurred on June 30, 2003 (the June Incident). On that day, Allen police responded to a report of children playing unsupervised in the street. The officers located the boys: R.B. was on the curb on one side of the street; J.B. was actually in the street, on the opposite side from his older brother. The police picked up the children, and R.B. was able to identify his house, some eight or nine houses away from where the boys had been playing. The police entered the house with R.B. and found Mother asleep on the couch. The police then inspected the house, took R.B. out to the squad car, talked with supervisors on the radio, retrieved equipment, and began taking pictures of the condition of the house. Mother did not stir until some fifteen minutes after the police entered the house. The police removed the children from the house that evening. Based on the June Incident,

Mother was charged with two counts of child endangerment. She was convicted and placed on probation.

Mother acknowledged that the June Incident was not an isolated one. She testified that on other occasions the children would get out and "most of the time [Mother] would get in [her] truck and just go drive down and get them." In connection with this problem, Department workers told Mother she must install more effective locks on the doors. Mother asked the Department to buy the locks, but the Department refused, deciding it was important for Mother to take the responsibility of fixing the problem. Mother testified she could not afford the locks, and the problem was only addressed much later when Mother's father paid a locksmith to do so.

Mother's own condition was a significant issue to Department workers, the CASA volunteer, and police officers who came in contact with her. Mother had been diagnosed, *inter alia,* with rheumatoid arthritis, fibromyalgia, Lyme's disease, chronic depression, and—after the death of her husband in 2003—post traumatic stress disorder. Mother had been declared disabled by the Social Security Administration. The record indicates that at the time of trial, Mother had been prescribed and was taking Lortab, Bextra, Prozac, and Xanax. At other relevant times, Mother had been prescribed and was taking Oxy-Contin, MS–Contin, and Paxil. Mother testified she had some drowsiness from the Lortab, but she believed she would have some drowsiness—regardless of medication—simply from dealing with her level of pain. A number of witnesses testified that when they interacted with Mother, she appeared to be under the influence of something or she appeared to be intoxicated. Witnesses testified she was unable to carry on a conversation concerning her children or to understand the concerns they raised with her. When officers found her asleep during the June Incident, they had difficulty arousing her. However, Mother was repeatedly drug tested, and the Department never offered test results to show she had used any drug other than those prescribed for her. Her prescriptions allowed her to take the amount of medicine she needed; no formal charges of drug abuse were ever brought against Mother. Mother attended AA meetings regularly and did not drink alcohol.

At the time of trial, the boys were living together in a foster home, where they had asked to stay. The foster parents had indicated a desire to adopt both boys.

*Disputed Evidence*

Evidence was disputed concerning the condition of the family's home. Department employees and police officers testified that the house was extremely dirty and unsanitary. Witnesses to the June Incident described rotting food in the kitchen, animal feces throughout the house, and garbage strewn about. The CASA volunteer charged with representing the children's interests testified that she discussed this concern with Mother, but Mother did not appear to understand the importance of keeping the home clean. On the other hand, Mother testified that she did keep the house clean; her daughter agreed.

Department employees testified that, while the children were in its custody, Mother frequently missed or was late to her visitation with the children. Mother denied missing visits unless she or the children were ill, and she testified she was late only once when she had tire trouble with her car.

## Conclusion

◼ Our legal sufficiency review requires us to disregard the evidence that a reasonable fact finder could have disbelieved or found to have been incredible; we assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *See J.F.C.,* 96 S.W.3d at 266. In this instance, we assume the jury resolved disputed facts concerning the condition of the home and Mother's faithfulness in attending visitation appointments in favor of the judgment, because a reasonable fact finder could do so. We conclude the evidence is clearly legally sufficient to support a finding that Mother engaged in conduct which endangered the well-being of the children. The evidence of Mother's disability, her required medication, and her resulting inability to oversee the safety of the children were well established by the record.

Likewise, when we give due consideration to all evidence the fact finder could reasonably have found to be clear and convincing, we find ample evidence to support the jury's finding of endangering conduct. *See id.* We conclude that all disputed evidence in this case could have been resolved by a reasonable fact finder in favor of the termination finding. The record is such that the jury could easily have determined Mother's condition had rendered her incapable of perceiving how and when her actions—or her inability to act—were causing risk to her children.

◼ Finally, we conclude the evidence is legally and factually sufficient to support the jury's finding that termination was in the children's best interest. Ample evidence established the children's physical safety was jeopardized when their sole caretaker was incapable of caring for them. Termination would allow the boys to be placed for adoption, perhaps in their present foster home where they were ex-periencing not only a safe environment, but a stable one for the first time. *See Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976).

We conclude the evidence is legally and factually sufficient to support the jury's verdict. We overrule Mother's second and third issues.

### MOTION FOR NEW TRIAL

In her final issue, Mother argues the trial court erroneously overruled her motion for new trial. The motion alleged the trial court "erred in admitting evidence that [Mother] pled guilty to child endangerment." The evidence in question was a judgment of conviction. During trial, Mother acknowledged this judgment of conviction showed she had pled guilty to "Abandon/Endanger Child" and received a probated sentence. Mother only took issue with the plea, testifying she had pled "not guilty." When this judgment was offered into evidence, Mother stated: "No objection, Your Honor."

◼ The first prerequisite to presenting a complaint for appellate review is a timely objection in the trial court. TEX.R.APP. P. 33.1(a)(1). In the absence of such an objection, nothing is preserved for our review. *In Interest of Shaw,* 966 S.W.2d 174, 182 (Tex.App.-El Paso 1998, no pet.). We overrule Mother's fourth issue.

### CONCLUSION

We have resolved all of Mother's issues against her. Accordingly, we affirm the judgment of the trial court.