# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-12-00125-CV

**David DeLarosa, Appellant**

**v.**

**John Klotz Stokes, M.D., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. D-1-GN-06-002153, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

David DeLarosa appeals from a final summary judgment terminating a health care liability claim he had asserted against appellee John Klotz Stokes, M.D. In three issues, DeLarosa complains of error by the district court in excluding the affidavit of DeLarosa's expert and granting summary judgment. We will overrule these contentions and affirm the district court's judgment.

### BACKGROUND

DeLarosa came under the care of Dr. Stokes, a neurosurgeon, after he suffered a neck fracture in an April 11, 2004 automobile accident and was transported to the emergency room at Austin's Brackenridge Hospital. On April 12, Stokes operated on DeLarosa to stabilize the fracture area and remove bone fragments. DeLarosa acknowledges that the surgery was successful in remedying his neck fracture and "may have saved him from potential paralysis." DeLarosa remained at Brackenridge until April 14, when he was discharged and went home. But on April 17,

an ambulance was summoned to DeLarosa's home, where he reported difficulty walking, soreness in his left thigh, and nausea, indicating further that he had begun experiencing difficulty walking as early as the afternoon of April 15. It turned out that DeLarosa had suffered strokes (i.e., interruption of blood flow to the brain) on both the right and left sides of his cerebellum. He was treated with aspirin and subsequently underwent physical therapy.

DeLarosa later sued Stokes, alleging that the neurosurgeon's professional negligence had caused him stroke-related damages. DeLarosa's liability theories centered on the neurosurgeon's acts or omissions in response to the discovery, prior to surgery, that one of the bone fragments from the accident had occluded (blocked) the patient's vertebral artery. As Stokes would later recognize during his deposition, this occlusion created a risk of stroke that ultimately came to pass—he attributed DeLarosa's strokes (he opined there were two, one on each side of the cerebellum) either to the blockage in the vertebral artery itself or "a little blood clot or a little collection of platelets" blocking other blood vessels above it. DeLarosa pled that Stokes was negligent in "failing to take any steps to address" the occlusion either during surgery or during DeLarosa's postoperative hospital stay and by not prescribing him medication to lower the risk of blood clots and strokes. Making matters worse, DeLarosa further asserted, Stokes was negligent in failing to warn him that he faced an increased risk of blood clots or strokes or to alert him to "the signs of blood clots and strokes for which he should be on the lookout," causing him to delay seeking treatment once stroke symptoms appeared.

Following discovery and after expert-designation deadlines had expired, Stokes filed a "traditional" motion for summary judgment on the ground that the deposition testimony of DeLarosa's sole expert, Dr. Charles Marable, negated proof of the requisite causal link between

2

DeLarosa's claimed damages and any breach of the duty of care. In support, Stokes attached the entirety of Marable's deposition, but emphasized the following exchanges:

> Q: Do you believe that Dr. Stokes's failure to give the instructions upon discharge that you talked about: If you have any of this laundry list of symptoms, you need to come back to the hospital immediately, was a breach of the standard of care?
>
> A: Yes.
>
> . . . .
>
> Q: Dr. Marable, it's my understanding, based on your testimony here today, that the only criticism that you have of Dr. Stokes that you believe rises to the level of a breach of a standard of care is his failure to give discharge instructions to Mr. De[L]a[r]osa on what to look for as signs of a possible stroke and to come back to the hospital immediately if he had any of those—
>
> A: Yes.
>
> Q: —correct?
>
> A: Yes.
>
> Q: Is that correct?
>
> A: Yes.
>
> . . . .
>
> Q: So regardless of whether Mr. DelaRosa came to the hospital on the 15th or 16th or, as he did, on the 17th, the only thing that could have been done was what was done for him, and it may or may not have changed the outcome, correct?
>
> A: Correct.
>
> Q: And you certainly can't say with reasonable medical probability the 15th or the 16th would have made a difference.
>
> A: No.

3

Q:     Or is that fair?

A:     That's fair.

Q:     That was a bad question on my part. And I think what you're saying is if, in fact, he had one stroke on the 15th and one stroke on the 16th, if he had come back in between, are you saying that potentially, if they had given him any Plavix, it may have prevented the second one, maybe?

A:     Yeah, brings him in for stuttering. They usually—they progress. A cerebral infarction, 24, 48 hours and they're usually done. Brainstem infarcts take up to five days to really settle in. I mean they can be acute or they can bump right along, and—and the sooner you get to him, you might be—if you save a few brain cells, you know, you've saved a few brain cells.

Q:     And so if I understand what you're saying, if Mr. DelaRosa had come in on the 15th or the 16th that he would have gotten dosed with Plavix sooner, and it may or may not had prevented a stroke if, in fact, he had a stroke after that fact?

A:     I think it could have lessened the seriousness of the effects of what he had.

Q:     And that's just a possibility; is that fair?

A:     Sure.

Q:     And so you're not going to testify to the jury, for example, if he had come in on the 15th or the 16th, then he would have better fine motor skills on this hand or he would not have—

A:     Possible.

Q:     It's just possible.

A:     He was not given that chance.

Q:     And certainly, you would agree that Dr. Stokes could have given him all the instructions that you believe he should have been given, and Mr. DelaRosa still wouldn't have come in.

A:     Sure.

Q:     I mean, you have patients that don't follow your advice all the time.

4

A:      Absolutely.  There's no discussion about that.

. . . .

Q:      And you—my understanding is, from your testimony, that that breach by him may or may not have changed Mr. DelaRosa's outcome.  That's just a possibility, but you can't say with reasonable medical probability.

A:      The physician has a duty to tell the patient about what the possible consequences of his illness are, and Dr. Stokes did not do that.

Q:      And you would agree, though, that his failure to do that may or may not have changed the outcome?

A:      That's true.

Q:      That you're not able to say with reasonable medical probability had he given those instructions, as you believe he should, that the outcome would be any different.  It's possible, but you can't say it's probable.

A:      Yes.

. . . .

Q:      And that you would agree that if Dr. Stokes had given those instructions that it's possible the outcome would have been different or the damages could have been lessened, but you can't say that with reasonable medical probability.

A:      Correct.

DeLarosa filed a response to Stokes's motion for summary judgment, attaching excerpts from the depositions of both DeLarosa and Stokes tending to establish that, as DeLarosa had alleged, the neurosurgeon had not given him instructions regarding the risk of stroke, the indicia of a stroke, or what to do if such signs appeared before discharging him.  More critically for our analysis, however, DeLarosa also attached an affidavit from Marable in which the expert purported to clarify and elaborate upon his prior deposition testimony.

5

In part, Marable reiterated his opinion to the effect that Stokes breached the standard of care by failing to "warn[] Mr. DeLarosa of his increased risk for stroke, of the signs and symptoms of stroke, and to return to the hospital immediately upon the first signs of a stroke," as "[o]nly with proper instruction would Mr. DeLarosa have been aware of what symptoms to look for, and of what to do at the outset of such symptoms." As for a causal connection to DeLarosa's injuries, Marable posited, "Had Mr. DeLarosa been properly instructed by Dr. Stokes, and had Mr. DeLarosa then returned to the hospital for treatment immediately after his first stroke, medical providers could and should have begun treatment then both to attempt to improve his recovery from that first stroke, and to reduce the possibility of Mr. DeLarosa having a second subsequent stroke." "Had that occurred," Marable concluded, "Mr. DeLarosa's recovery may have been better, and the subsequent strokes may have been prevented." Marable made the identical assertions with respect to DeLarosa's second stroke and any subsequent strokes that occurred. However, the expert ultimately conceded that "[a]s I have previously testified, I cannot say that prior treatment before any one stroke would to a reasonable medical probability have prevented a subsequent stroke"—in fact, he admitted that "according to the studies to date, all of the remaining treatment options available offer less than a 51% chance of preventing an additional stroke following a single stroke"—or that "proper treatment following any one stroke would to a reasonable medical probability have improved Mr. DeLarosa's recovery from that one stroke." But despite these concessions, Marable attempted to establish the requisite causal linkage in two ways.

First, Marable relied on the premise that, "[f]rom the history in the medical records"—which were not attached to Marable's affidavit—"it appears that Mr. DeLarosa suffered a string of multiple strokes after he was released from the hospital." Thus, Marable reasoned, "due

6

to Dr. Stokes'[s] failure to follow the applicable standard of care, Mr. DeLarosa missed at least three opportunities to receive treatment which could have prevented subsequent strokes" and likewise "lost at least three opportunities to receive immediate, timely treatment for his multiple strokes." And, while conceding that any one of these lost opportunities could not be shown to have singularly impacted DeLarosa's outcome within a reasonable medical probability, or even that the first two had in combination, Marable insisted nonetheless that "[b]ased on all of these opportunities *collectively* to provide proper treatment, had Dr. Stokes acted within the proper standard of care and . . . properly instructed Mr. DeLarosa on the signs and symptoms of stroke and to return to the hospital immediately upon the appearance of the first symptoms so that proper medical treatment could have been provided timely, then there is a reasonable medical probability that the injuries suffered by Mr. DeLarosa as a result of the *multiple* strokes would have been reduced or prevented." (Emphases added.)

The second way in which Marable attempted to demonstrate a causal linkage was by suggesting that a broader range of acts or omissions by Stokes constituted breaches of the duty of care and, in turn, were causes of DeLarosa's injuries. Returning to a theme from his deposition, Marable asserted that "Dr. Stokes should have kept Mr. DeLarosa in the hospital for a longer period of time for observation given his increased risk of stroke," but again stopped short of "say[ing] that his discharge alone rises to the level of medical malpractice or falls outside the applicable standard of care." But, Marable averred, "I do believe it rose to the level of medical malpractice and breached the applicable standard of care for Dr. Stokes to prematurely discharge Mr. DeLarosa when he did instead of keeping him for further observation *and* to fail to instruct Mr. DeLarosa or his care giver on the signs and symptoms of stroke so they could observe for those symptoms themselves."

7

(Emphasis in original.) And, Marable continued, "[h]ad Mr. DeLarosa been kept in the hospital even one more day, then hospital staff would have been able to recognize the onset of the symptoms of Mr. DeLarosa's first stroke, and could have begun treatment immediately" and would have been in a position thereafter to treat the succession of "multiple strokes" and, within a reasonable medical probability, reduce or prevent DeLarosa's damages therefrom.

Marable further asserted that Stokes breached the standard of care by failing to "treat[] Mr. DeLarosa before his release from the hospital with Plavix or a similar drug to reduce Mr. DeLarosa's chances of having a stroke in the first place." The expert concluded that, "[t]aken collectively, Dr. Stokes'[s] failures to act within the proper standard of care, by failing to initially treat Mr. DeLarosa before his release from the hospital with Plavix or a similar drug to reduce Mr. DeLarosa's chances of having a stroke in the first place, by failing either to keep Mr. DeLarosa in the hospital where he could be observed by competent medical staff and where proper treatment could have been provided timely, or to properly instruct Mr. DeLarosa on the signs and symptoms of stroke and to return to the hospital immediately upon the appearance of the first symptoms, were a substantial factor in bringing about Mr. DeLarosa's injuries which could have been avoided or lessened but for Dr. Stokes'[s] failures."

In reply, Stokes argued that DeLarosa had failed to raise a fact issue as to causation and, further, objected to Marable's affidavit on the grounds that (1) his opinions were based on medical records that were not attached as required by Tex. R. Civ. P. 166a(f); (2) his opinions were unsupported by or inconsistent with underlying facts, and thus incompetent; and (3) his affidavit was a "sham" and incompetent to raise a fact issue. Following a hearing, the district court sustained Stokes's objections in their entirety and granted his summary-judgment motion. This appeal ensued.

8

## ANALYSIS

DeLarosa brings three issues on appeal. In his first, he argues that the district court abused its discretion in excluding Marable's affidavit. In the second, DeLarosa urges that Marable's affidavit, if considered, raises a genuine issue of material fact as to causation such that the district court erred in granting summary judgment. In what he styles as his third issue, DeLarosa advocates a legal premise underlying some of his assertions in support of his other two issues: that the district court erred by "consider[ing] each failure and each missed opportunity for treatment individually and separately when considering causation," rather than "consider[ing] the combined effect, as [Marable] did, of all failures by [Stokes] and all missed opportunities for treatment caused by [Stokes's] negligence together."

### Standards of review

We review the district court's exclusion of evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *see Fairfield Fin. Grp., Inc. v. Synnott*, 200 S.W.3d 316, 319 (Tex. App.—Austin 2009, no pet.) (applying same standard to exclusion of summary-judgment evidence). A trial court abuses its discretion when it makes a decision that is arbitrary or unreasonable or that is without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). We must uphold the district court's evidentiary ruling if there is any legitimate basis for it. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

We review the district court's summary-judgment ruling de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). A party moving for summary judgment must

9

demonstrate that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). Where, as here, a defendant moves for summary judgment under the "traditional" standard, he must meet the initial burden of either conclusively negating at least one essential element of each of the plaintiff's causes of action or conclusively establishing each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). If the defendant meets this initial burden, he is entitled to summary judgment unless the non-movant plaintiff presents summary-judgment evidence raising a genuine issue of material fact as to one of the elements at issue. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and indulge every reasonable inference and resolve all doubts in his favor. *Id*.

**Exclusion of Marable's affidavit**

DeLarosa's first issue on appeal asserts that the district court abused its discretion in excluding Marable's affidavit. We disagree. Rule 166a of the Texas Rules of Civil Procedure requires, among other things, that summary-judgment affidavits include as an attachment "[s]worn or certified copies of all papers or parts thereof referred to in [the] affidavit." Tex. R. Civ. P. 166a(f). Marable explicitly averred that he based his opinion that DeLarosa had "a string of multiple strokes" on his review of DeLarosa's medical records, and the contents of the record were likewise integral to other opinions he expressed regarding causation. However, these records were not attached to Marable's affidavit. Stokes objected to the omission of these medical records, pointing out both

10

Marable's failure to comply with rule 166a(f) and that absent the records, Marable's assertion that DeLarosa suffered multiple strokes lacked any underlying factual basis and was thus incompetent. In response, DeLarosa suggests that the failure to attach the medical records is of no consequence because it was obvious from context and his deposition on what records he was relying. But the bottom line here is that by failing to attach referenced documents, Marable's affidavit violated rule 166a(f)'s requirements and, accordingly, we cannot say that the district court abused its discretion in excluding Marable's affidavit. *See Guthrie v. Suiter*, 934 S.W.2d 820, 824–25 (Tex. App.—Houston [1st Dist.] 1996, no writ) (holding that expert affidavit that did not include copies of supporting documents as required by rule 166a(f) was inadmissible as summary-judgment evidence).

DeLarosa argues that, even if the failure to attach supporting documents rendered the affidavit defective under rule 166a(f), the trial court should have given him the opportunity to amend Marable's affidavit because the failure to attach referenced documents to a summary-judgment affidavit is a defect in form rather than in substance. *See Martin v. Durden*, 965 S.W.2d 562, 565 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (holding that failure to attach documents relied on in rendering expert opinion is defect in form); *but see Ceballos v. El Paso Health Care Sys.*, 881 S.W.2d 439, 445 (Tex. App.—El Paso 1994, writ denied) (holding that same failure is defect in substance). But DeLarosa had the opportunity to amend or at least seek to amend the defect when Stokes filed his objection based on that deficiency. *See* Tex. R. Civ. P. 166a(f). Further, to the extent that DeLarosa asserts on appeal that he asked the district court to amend the affidavit, but that the district court did not rule on his request, DeLarosa failed to preserve that complaint for

appeal. *See* Tex. R. App. P. 33.1 (requiring that trial court have ruled on request or refused to rule on the request and the complaining party object to that refusal).

We overrule DeLarosa's first issue on appeal.

## Question of fact

Even if we were to assume that Marable's affidavit met rule 166a(f)'s requirements such that we should consider all or part of it, however, the affidavit does not raise a genuine issue of material fact regarding causation. "'[P]laintiffs [in medical-malpractice cases] are required to adduce evidence of a "reasonable medical probability" or "reasonable probability" that their injuries were caused by the negligence of one or more defendants, meaning simply that it is "more likely than not" that the ultimate harm or condition resulted from such negligence.'" *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010) (quoting *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993)). Here, Stokes presented summary-judgment evidence, principally in the form of Marable's deposition transcript discussed above, conclusively establishing that there was no causal link between DeLarosa's injury and Stokes's alleged negligence—i.e., discharging DeLarosa from the hospital without educating him about his increased risk for stroke and the signs of stroke and warning him to go to the hospital if he experienced any of those signs. In that deposition testimony, Marable admitted that he could not say with reasonable medical probability that Stokes's failure to give DeLarosa proper discharge instructions resulted in a different outcome for DeLarosa—i.e., Marable could not say that if Stokes had properly warned DeLarosa, DeLarosa would probably have had a better outcome. Thus, Stokes presented summary-judgment evidence conclusively negating an element of DeLarosa's claim, entitling him to summary judgment unless

12

DeLarosa presented summary-judgment evidence raising a genuine issue of material fact on that element. *See Willrich*, 28 S.W.3d at 23.

In his second and third issues on appeal, DeLarosa argues that Marable's affidavit raises a question of fact on the element of causation and, relatedly, that the district court should have considered the combined effect of each alleged failure and missed opportunity for treatment together in determining whether Stokes's alleged acts or omissions caused DeLarosa's injuries, rather than rely on Marable's deposition testimony that he could not say, to a reasonable medical probability, that Stokes's negligence caused DeLarosa's injury. In other words, DeLarosa argues that Marable's affidavit shows that *if* Stokes had given DeLarosa proper discharge instructions and warnings regarding the signs of stroke *and if* DeLarosa had sought treatment after *each* of his *three* strokes, his injuries *from the multiple strokes* would have been reduced or prevented. We disagree.

DeLarosa's causation theory rests on the premise that DeLarosa suffered at least three strokes after his neck surgery. This is because, as discussed previously, Marable could not state with a reasonable degree of medical probability that any one of these opportunities had singularly affected DeLarosa's outcome, or even that the first two had in combination, but rather only that all the missed opportunities collectively resulted in a worse outcome. However, the competent summary-judgment evidence in the record—namely excerpts from Stokes's and Marable's depositions—establishes only that Stokes thought, based on DeLarosa's MRI, that DeLarosa had two strokes following his neck surgery and that Marable, based on his review of DeLarosa's medical records, thought that DeLarosa had as few as two strokes or possibly "multiple" strokes. Although Marable's summary-judgment affidavit specifically refers to three strokes, he based that assertion on facts shown in DeLarosa's medical records that, as discussed, were not attached to his affidavit.

13

To that extent, Marable's testimony that DeLarosa suffered from three strokes is a conclusion unsupported by facts and is, thus, incompetent. *See Ryland Grp., Inc. v. Hood*; 924 S.W.2d 120, 122 (Tex. 1996) ("Conclusory affidavits are not enough to raise fact issues."); *City of San Angelo Fire Dep't v. Hudson*, 179 S.W.3d 695, 701 n.6 (Tex. App.—Austin 2005, no pet.) (agreeing that witness's failure to explain conclusion with supporting facts rendered affidavit incompetent summary-judgment evidence (citing *Ryland*, 924 S.W.2d at 122); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984)); *see also Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999) ("Summary judgment can be granted on the affidavit of an interested expert witness, . . . but the affidavit must not be conclusory . . . . [R]ather, the expert must explain the basis of his statements to link his conclusions to the facts."). His subsequent conclusions based on those unsupported facts are likewise incompetent summary-judgment evidence. *See Ryland*, 924 S.W.2d at 122.

We overrule DeLarosa's second and third issues.

## CONCLUSION

Having overruled each of DeLarosa's issues on appeal, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   August 17, 2012

14