

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-23-00103-CV

**IN THE INTEREST OF M.R.E.**, a Child

From the 45th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-01853
Honorable Richard Garcia, Judge Presiding

Opinion by:     Lori I. Valenzuela, Justice

Sitting:     Luz Elena D. Chapa, Justice
Irene Rios, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: July 5, 2023

AFFIRMED

On September 28, 2022, the trial court held a bench trial at which several witnesses testified. Following the hearing, the trial court signed an Order of Termination terminating A.E.'s parental rights to her daughter, M.R.E.[1] and naming the Department of Family and Protective Services (the "Department") as permanent managing conservator of M.R.E. We affirm.

### STANDARD OF REVIEW

To terminate parental rights pursuant to Family Code section 161.001, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. *See* TEX.

---

[1] To protect the privacy of minor children, we use initials to refer to the child and her biological parents. TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2). M.R.E. was born on January 31, 2008 and was fourteen years old at the time of trial.

FAM. CODE §§ 161.001(b), 161.206(a). A.E. filed an appeal in which she challenges only the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights was in M.R.E.'s best interest.

When reviewing the sufficiency of the evidence, we apply the well-established standards of review. *See* TEX. FAM. CODE §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (factual sufficiency); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (legal sufficiency). To determine whether the evidence is legally sufficient in parental termination cases, we look at all the evidence in the light most favorable to the trial court's finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *J.P.B.*, 180 S.W.3d at 573. The trier of fact is the sole judge of the credibility of witnesses and the weight to be given their testimony. *J.P.B.*, 180 S.W.3d at 573. We therefore defer to the fact-finder regarding credibility determinations.

With regard to a factual-sufficiency challenge to the termination grounds, we must perform "an exacting review of the entire record." *See In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). We nevertheless give due deference to the factfinder's findings and do not supplant the judgment with our own. *H.R.M.*, 209 S.W.3d at 108. As relevant here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved termination of A.E.'s parental rights was in M.R.E.'s best interest. *See* TEX. FAM. CODE

§ 161.001(b)(1)(E); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18-19. But if a factfinder reasonably could not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

While we must detail the evidence relevant to the issue of parental termination when reversing a finding based upon insufficient evidence, we need not do so when affirming a verdict of termination. *A.B.*, 437 S.W.3d at 503.

## BACKGROUND

The Department called four witnesses to testify. Neither A.E. nor any of the two alleged fathers appeared at the hearing. Storm Rivas, M.R.E.'s counselor, testified his first counseling session with M.R.E. was on November 23, 2021; and they meet once a week to address managing M.R.E.'s social anxiety, adjusting to past experiences, processing those past experiences, and appreciating that she has a good, healthy understanding of what occurred. Rivas stated M.R.E.'s "past experiences" related to living with her mother. Rivas said that, early in the counseling process, M.R.E. had "very debilitating anxiety, to the point where she was having difficulty functioning within her school and other social situations amongst her peers." Presently, M.R.E. is "doing fairly well and engaging in several social interactions; no longer having anxiety attacks; [and] engaging with her peers at [an] increased rate."

M.R.E. currently lives with her maternal grandmother, Juanita E. According to Rivas, M.R.E. "[n]ot once has . . . ever reported that she would like to go back to live with her mother." Rivas said they discussed her mother in detail and, "[a]ccording to [M.R.E.'s] self-reports within some of the counseling sessions, as early – as recent as yesterday even, talking about this case, she was definitely anxious about the potential outcome of this case." Rivas believed that returning

M.R.E. to her mother would cause M.R.E. "great distress." He believed M.R.E. has done "fairly well" with her anxiety and is ready for discharge. However, Rivas recommended M.R.E. continue counseling for the next month following the outcome of this case. Rivas believed it was in M.R.E.'s best interest to remain with her grandmother.

The Department's case worker, India Doromal, testified she was the case worker from October 2021 to April 2022. Doromal said M.R.E. was brought into care due to concerns regarding A.E.'s "substance abuse and severe mental health," and because she was threatening to harm M.R.E. Doromal said she met with A.E. once in person and thereafter they would communicate via email. When asked if she spoke to A.E. about her service plan, Doromal stated she attempted to do so, but, "in meeting with her, [A.E.] started saying a lot of random things that didn't really make any sense. So, I was – I was not able to actually speak to her about the case, or even get any information to begin an FSNA process, or even talking about her family plan." Doromal explained that when speaking to A.E.,

> [A.E.] kind of went into a loop about the FBI or satellites from New York. And then, trying to engage her back into conversations pertaining to the services, she would tell me to stop, we don't talk about the rules, and then she would continue to write down on her paper just, like, random things.
> So, we never got anywhere pertaining to services, or anything like that, during the meeting.

Doromal said she and A.E. communicated on a regular basis via email and she "was constantly trying to get [A.E.] into services and trying to meet with her." Doromal tried to explain to A.E. the importance of doing her services. She testified A.E. did not provide proof of following up with any of her services, proof that she completed any services, and she did not complete a psychological evaluation or drug test.[2] A.E. reached out to one provider in an email but she never

---

[2] A.E.'s service plan, which was admitted into evidence, required her to obtain employment and housing, submit to random drug testing, complete a drug and alcohol assessment, complete a psychological evaluation, complete

completed the appropriate paperwork. A.E. asked once, also in an email, why she had not been able to visit with M.R.E. and Doromal asked A.E. to meet with her in person so that Doromal could explain everything. They met once at the end of March to discuss the service plan, but A.E. told Doromal to "stop talking about it because we don't talk about the rules." Doromal did not know where A.E. lived, and she did not know whether A.E. provided support for her daughter.

Doromal said she observed the grandmother's house and considered it "always appropriate [and] always well-kept and clean." She said M.R.E. had her own room in the house, and M.R.E. "felt completely comfortable with her grandparents." M.R.E. never told Doromal she wanted to return to her mother. Doromal believed it was in M.R.E.'s best interest to remain with her grandmother "as a full-time, forever home" because M.R.E. feels "completely safe and comfortable with her grandmother," "things have been going pretty well there," and M.R.E. is now happy and healthy. Doromal said M.R.E. told her that A.E. attempted to reach out to her, but M.R.E. would never respond and M.R.E. did not want to see or talk to her mother.

Lorena Gonzalez, the current legal case worker, said she was assigned the case in August 2022. She had never met A.E. and had spoken to her only once on the telephone. Gonzalez said they communicated via email to discuss A.E.'s service plan, but A.E. did not want to participate. She said she would email A.E. about engaging in her services and A.E. would never respond to Gonzalez's questions or emails about scheduling a meeting. "Instead, she would go off on these tangents about how the Department was human trafficking and that she could hear her daughter screaming and things that just kind of didn't make sense." Gonzalez stated A.E. had not taken a drug test, provided any support for M.R.E., or visited with M.R.E.

---

individual psychological counseling, attend family violence prevention services, take an anger management class, and take a parenting class.

Gonzalez said she had met with M.R.E. who was "doing well." She said the grandmother had been providing the necessary items and care for M.R.E., including her doctor, dental, and vision appointments. She had no concerns about the grandmother's home and she testified it was safe and stable. She said M.R.E. is not taking any psychotropic medications, is doing well in school, and has been promoted to the ninth grade. She believed termination of A.E.'s parental rights was in M.R.E.'s best interest for the following reasons:

> One, because this is what [M.R.E.] wants. [M.R.E.] has expressed . . . that she wants to be adopted by her grandmother, she wants stability in her life. And she does have a lot of anxiety about what happened – what will happen if termination is not granted.
> And, also, the parents in this case have not done any services.
> The fathers have not reached out to the Department, or even to [Juanita E.], inquiring about their alleged daughter.
> And [A.E.] continues to be avoidant with the Department and appears to not want to engage in services.

Gonzalez believed returning M.R.E. to her mother "would negatively impact her[, and M.R.E.] has expressed . . . that is a big fear and she does not know what she would do if that were to occur." Gonzalez believed M.R.E. was afraid of her mother. However, she said Juanita E. was a protective grandmother and she trusted Juanita E. to make the decision about whether visitation with A.E. was in M.R.E.'s best interest. Gonzalez said M.R.E. did not "want anything to do with [her] mom anymore."

Juanita E. was the final witness to testify and she agreed that termination of A.E.'s parental rights was in M.R.E.'s best interest. Juanita E. has taken care of M.R.E. since she was six years old because A.E.'s "mental health is really, really bad. [M]ost of the time, [A.E.] doesn't know what she is saying, doesn't know what she's doing. She just has a few moments that she knows who she is." Juanita E. said A.E. did not have a place to stay and she "stays here and there." Juanita E. had not spoken to A.E. in about two weeks and did not know where she was living. She stated A.E. had been diagnosed with schizophrenia. She said A.E. "left her belongings and I saw

a yellow piece of paper, so I read it and it said there that she had to be taking medications." Juanita E. said she then questioned A.E. about the note and A.E. told her she was taking her medication, but she did not want to take it anymore because it made her sleep the entire day.

Juanita E. said she never saw A.E. take any drugs, but

> I just saw the reaction that [A.E.] would have because she would leave the house and then come back really – not herself. She – she would be very angry at us, cuss at us, tell us all kinds of things, attack us.
> And another thing was that she would come and she would tell me that she had bugs all over her, and I couldn't get her to – to understand that she didn't have any bugs on her, it was just something that she was going through.

Juanita E. said M.R.E. was afraid of her mother and she was afraid of her daughter. She wanted A.E.'s parental rights terminated and she wanted to adopt M.R.E. When asked why she believed this course of action to be in M.R.E.'s best interest, she replied:

> A. Well, because right now, this child feels like she doesn't belong anywhere. She's with her mom and with us, you know, she is kind of like in limbo right now. She's not sure what's going to happen with her.
>     And I want her to – to feel that she belongs somewhere and that nobody can come take her away.
> Q. And has that been a fear for you this whole time –
> A. Yes.
> Q. – that her mom could come get her?
> A. Yes. Yes. I'm afraid she might go to one of the schools or just pick her up from the street.

The trial court later signed an Order of Termination and A.E. appealed raising only a challenge to the sufficiency of the evidence in support of the best interest finding.

## BEST INTEREST

When considering the best interest of the child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "[T]he best interest standard does not permit termination [of parental rights] merely because a child might be better off living elsewhere." *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (citation omitted).

However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE § 263.307(a).

The Department has the burden to rebut these presumptions by clear and convincing evidence. *See In re J.C.M.*, No. 04-22-00718-CV, 2023 WL 2520597, at *2 (Tex. App.—San Antonio Mar. 15, 2023, no pet. h.) (mem. op.). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. To determine whether the Department satisfies its burden, the Texas Legislature has provided several factors[3] for courts to consider regarding a parent's willingness and ability to provide a child with a safe environment, and the Texas Supreme Court has provided a similar list of factors[4] to determine a child's best interest. TEX. FAM. CODE § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

A best-interest finding does not require proof of any particular factors. *See In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *5 (Tex. App.—San Antonio Apr. 29, 2015, no pet.)

---

[3] The statutory factors include: "(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills [. . .]; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child." TEX. FAM. CODE § 263.307(b).

[4] The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72.

(mem. op.). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at \*3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.); *see In re C.H.*, 89 S.W.3d at 27 (Department need not prove all nine *Holley* factors, and the absence of evidence relevant to some of those factors does not bar a finding that termination is in the child's best interest). "A trier of fact may measure a parent's future conduct by [her] past conduct [in] determin[ing] whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). In analyzing these factors, the court must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

## ANALYSIS

On appeal, A.E. contends the evidence is insufficient to support the trial court's best interest finding because the Department did not present adequate evidence on the following four *Holley* factors: (2) the emotional and physical needs of the child now and in the future; (5) the programs available to assist those individuals to promote the best interest of the child; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. However, neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *J.B.-F.*, 2018 WL 3551208, at \*3; *see C.H.*, 89 S.W.3d at 27. Therefore, the alleged lack of evidence on four *Holley* factors is not dispositive.

We conclude the evidence supports the trial court's finding. Three witnesses testified M.R.E. indicated a desire to stay with her grandmother and she did not want to return to her mother.

*See In re C.M.C.*, 273 S.W.3d 862, 876 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("As to the desires of the children, McCartney testified that C.E.C. told her that he was afraid of Latanya, hated her, and did not want to return to live with her. . . . C.M.C. told McCartney that she did not want to go back to Latanya because she did not feel safe with her and Latanya did not take very good care of her."); *In re J.D.G.*, 570 S.W.3d 839, 854 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("Jorge verbally expressed that he did not want to visit Monica. Andres would experience nightmares after his visits. These children are young, and their desires have not been clearly expressed; however, this evidence tends to indicate that the children do not hold a desire to return to their mother's care.").

Talking about her mother raises M.R.E.'s anxiety; M.R.E.'s mental health improved under her grandmother's care to the point where she could be discharged in the near future; and returning M.R.E. to her mother would cause M.R.E. "great distress." M.R.E. is afraid of her mother. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at *7 (Tex. App.—San Antonio June 24, 2020, pet. denied) (mem. op.) (affirming that termination was in child's best interest when there was evidence the child was fearful of his mother and did not want to return to her care, he was bonded with his father, was doing well in school, and was exhibiting fewer symptoms associated with PTSD and anxiety while removed from his mother).

A.E. stopped taking her medication for schizophrenia and has deteriorated to the point that she often does and says things that do not make sense. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (trial court can consider a parent's mental state and noncompliance with medication as factors that endanger a child if the parent's mental state allows for conduct that endangers the child's physical or emotional well-being); *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (considering mother's schizophrenia and resulting suicidal thoughts, hospitalizations, and violence). A.E. has not visited M.R.E. or

provided M.R.E. with any support. *See In re R.B.*, 200 S.W.3d 311, 316-17 (Tex. App.—Dallas 2006, pet. denied) (indicating that parent missing and arriving late to visits are acts or omissions indicating termination is in child's best interest).

One of the grounds on which the court terminated A.E.'s parental rights was A.E.'s failure to engage in any of her services that would have supported M.R.E.'s return to A.E.[5] Evidence that proves a statutory predicate ground for termination is probative on the issue of best interest. *C.H.*, 89 S.W.3d at 28. A.E. has not obtained stable housing or employment. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *8 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.) (considering parent's failure to obtain and maintain stable housing and employment as a factor in support of finding that termination was in the best interest of the children because parent's conduct subjected the children to a life of uncertainty and instability). On the other hand, M.R.E. currently lives with Juanita E. who wants to adopt her, Juanita E.'s home is a stable environment and is well-kept and clean, M.R.E. has her own room, and M.R.E. feels safe and comfortable with her grandmother. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) ("The stability of the proposed home environment is an important consideration in determining whether termination is in the child's best interest.").

---

[5] The trial court terminated A.E.'s parental rights on four predicate grounds: (1) she voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months, pursuant to Family Code section 161.001(b)(1)(B); (2) she knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child, pursuant to section 161.00l(b)(l)(D); (3) she constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department for not less than six months and (a) the Department has made reasonable efforts to return the child to the mother; (b) the mother has not regularly visited or maintained significant contact with the child; and (c) the mother has demonstrated an inability to provide the child with a safe environment pursuant to section 161.001(b)(1)(N); and (4) she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the child who has been in the permanent, or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to section 161.001(b)(1)(O).

We conclude the evidence is both legally and factually sufficient to support the trial court's best interest finding. Therefore, we overrule A.E.'s issue on appeal and affirm the trial court's Order of Termination.

Lori I. Valenzuela, Justice